# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DOUGLAS W. FELDE,

     Plaintiff,

     v.                                Case No. 18-CV-84

MILWAUKEE COUNTY, CHRISTOPHER
LUKAS, KENNETH SKOWRONSKI,
TIMOTHY BROWN, and MARCUS BROWN,

     Defendants.

---

## DECISION AND ORDER ON DEFENDANTS' MOTIONS
## FOR SUMMARY JUDGMENT

---

Douglas W. Felde filed a lawsuit against Milwaukee County (the "County") alleging violation of 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203(a)–(b), as amended; and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.* (Am. Compl., Docket # 20.) Felde also sued four individual employees and former employees under the Equal Protection Clause of the Fourteenth Amendment via 28 U.S.C. § 1983. (*Id.*) The County filed a motion for summary judgment (Docket # 50), and the other defendants filed a joint motion for summary judgment (Docket # 51). After careful review of the record and for the reasons explained below, while I sympathize with Felde, who credibly alleges an extremely unpleasant and often degrading work environment, I must grant both motions.

## BACKGROUND

Felde worked for Milwaukee County as an airport maintenance worker at General Mitchell International Airport ("GMIA") from November 4, 2004 until he retired on April

22, 2016. (Plaintiff's Proposed Findings of Fact ("PPFOF") ¶ 1, Docket # 74 and Defendants' Resp. to PPFOF ("Defs.' Resp.") ¶ 1, Docket # 81.) Felde had worked for the County in other positions since March 1991 and transferred to GMIA with thirteen years of seniority. (Defendants' Proposed Findings of Fact ("DPFOF") ¶¶ 1–4, Docket # 65 and Plaintiff's Resp. to DPFOF ("Pl.'s Resp.") ¶ 1–4, Docket # 71.) More seniority allowed an employee to have preferential shift selection, assignments, and vacations. (*Id.* ¶ 4.) Felde retired on April 22, 2016. (PPFOF ¶ 1 and Defs.' Resp. ¶ 1.)

Felde currently identifies as a gay man, but never told any co-workers that he was gay. (PPFOF ¶ 2 and Defs.' Resp. ¶ 2.) Additionally, Felde has been diagnosed with bipolar disorder since at least 2007. (PPFOF ¶ 94 and Defs.' Resp. ¶ 94.) Felde began therapy in 2012 and held himself out to his therapist as being heterosexual. (DPFOF ¶ 6 and Pl.'s Resp. ¶ 6.)

*Alleged Sexual Harassment/Hostile Work Environment*

Felde alleges chronic harassment during his employment at GMIA in the form of name-calling, offensive remarks, and physical aggression. He catalogues dozens of actions by dozens of individuals over more than eleven years, virtually all of which he alleges were motivated by his sexual orientation or failure to conform to gender stereotypes. (PPFOF ¶¶ 3–83.) Felde alleges that this mistreatment made his employment so intolerable that he had to take early retirement in 2016. (*Id.* ¶ 92.)

Felde complained to supervisors about mistreatment by co-workers several times during his employment. In November 2005, he filed a written complaint with a manager, defendant Christopher Lukas, about an obscene gesture and profane language directed toward him. (PPFOF ¶ 12 and Defs.' Resp. ¶ 12.)

2

In January 2012, Felde reported being called sexually derogatory names, being questioned about his sexual preferences, being verbally and physically bullied by co-workers, and having his personal property vandalized. (PPFOF ¶¶ 31–33 and Defs.' Resp. ¶¶ 31–33.) In February 2012, Felde disclosed further incidents, including one in which co-worker Dushon Wilson allegedly hit Felde on the head with his penis. (PPFOF ¶¶ 34–35 and Defs.' Resp. ¶¶ 34–35.)

Felde claims that in 2013 he told a supervisor, defendant Kenneth Skowronski, that his coworkers were ridiculing his biking clothes and making offensive and demeaning remarks about the fit of his biking clothes and his state of undress in the locker room, taunting him with remarks insinuating that Felde was gay. (PPFOF ¶ 54 and Defs.' Resp. ¶ 54.)

In December 2014, Felde told Skowronski about two recent actions by co-workers as well as other incidents that had occurred in the past. (PPFOF ¶¶ 59–60 and Defs.' Resp. ¶¶ 59–60.) On February 20, 2015, Felde filed a grievance requesting a meeting to discuss the allegedly hostile work environment. (PPFOF ¶ 69 and Defs.' Resp. ¶ 69.) On April 27, 2015, Felde met with County Human Resources representative Lisa Terry and presented a six-page statement detailing perceived mistreatment throughout his employment. (PPFOF ¶ 73 and Defs.' Resp. ¶ 73.)

During the relevant time period, Milwaukee County's Sexual Harassment Policy described the procedures for reporting harassment as follows:

> If you feel you have been sexually harassed by an employee, manager, elected official, customer, vendor, or contractor, or if you have observed such conduct in the workplace, please follow the procedures below:

• Report the problem to your supervisor, a higher-level manager within your business line, Human Resources, or the Employee Relations Hotline (278-2000). There are many people who are in a position to help - but it is difficult to help if the problem is not reported.
• Maintain confidentiality. During the investigation, we will ask all parties to keep information that is shared confidential. This is in the best interest of all parties who may be affected by or included in the investigation.
• Inform Human Resources if you feel you are being retaliated against as a result of reporting the sexual harassment. Retaliation against the complainant or witnesses will not be tolerated.
• Consider using our employee assistance program. United Healthcare offers free professional counseling to employees who need guidance and counseling during difficult situations. The program is not a substitute for reporting the incident to Milwaukee County, but it exists to help you deal with the emotional and stressful implications of these types of problems.

Once an incident is reported, Human Resources will ensure a prompt and thorough investigation. The investigation may include interviews with the person who feels harassed, the accused harasser, and witnesses, as appropriate. Every effort will be made to keep all complaints and the details of the situation as confidential as possible. However, it may be necessary to share information with others on a "need to know" basis during the investigation.

(Declaration of Scott Brown ("Brown Decl.") ¶ 3, Ex. A at 3, Docket # 52-1.) The policy

also required managers to report and act on problems, as follows:

If you see or hear of unacceptable behavior within or outside of your work group - whether by a manager, employee, elected official, customer, vendor, or contractor - it is your responsibility to report and act on that behavior promptly. Your knowledge of inappropriate behavior may result in County liability if prompt and appropriate action is not taken.

(*Id.*) The policy reiterated that managers were to "[r]eport the behavior to Human Resources

so that the problem can be investigated immediately." (*Id.* at 4.)

*Alleged Failure to Accommodate*

In January 2012, Felde disclosed to Lukas and County Human Resources

Coordinator Sean Moore that he had bipolar disorder. (PPFOF ¶¶ 114–15 and Defs.' Resp.

4

¶¶ 114–15.) Felde did not request any accommodation for his bipolar disorder at that time. (DPFOF Resp. ¶ 43 and Pl.'s Resp. ¶ 43.) Lukas and Moore later asked Felde if he needed an accommodation and he said no; Felde indicated that he had just wanted to make them aware of it. (DPFOF ¶ 45 and Pl.'s Resp. ¶ 45.)

In 2014 and 2015, Felde unsuccessfully requested to be assigned to Timmerman Airport. (PPFOF ¶ 65 and Defs.' Resp. ¶ 65.) Felde asserts that he told Skowronski and Lukas in December 2014 that he had bipolar disorder and that the environment at GMIA was exacerbating it, and requested to be assigned to Timmerman Airport as an accommodation. (PPFOF ¶¶ 61, 65 and Defs.' Resp. ¶¶ 61, 65.) Felde filed grievances on January 29, 2015 and February 25, 2015 about not being assigned to Timmerman. (PPFOF ¶ 69 and Defs.' Resp. ¶ 69.) Neither grievance mentioned bipolar disorder, disability, or accommodations. (*Id.*) During a meeting with Lukas and County Human Resources representative Luis Padilla on November 4, 2015, Felde claims to have again asked Lukas, unsuccessfully, to reassign him to Timmerman as an accommodation for his disability. (PPFOF ¶ 85 and Defs.' Resp. ¶ 85.)

*Procedural History*

Felde filed an intake questionnaire with the Equal Employment Opportunity Commission ("EEOC") in March 2015 and a charge of discrimination on April 26, 2015. (EEOC Charge No. 443-2015-00628, Brown Decl. ¶ 9, Ex. G, Docket # 52-7.) Felde filed a second EEOC intake questionnaire on February 1, 2016 and a charge of discrimination with the Wisconsin Equal Rights Division on March 21, 2017. (EEOC Charge No. 443-2017-00456, Brown Decl. ¶ 10, Ex. H, Docket # 52-8.) A right-to-sue letter was issued for the

latter charge on October 23, 2017. (Am. Compl. Ex. 4, Docket # 20-4.) A right-to-sue letter was issued for the earlier charge on March 6, 2018. (Am. Compl. Ex. 3, Docket # 20-3.)

Felde filed a complaint in this court on January 16, 2018 (Compl., Docket # 1) and an amended complaint on April 20, 2018 (Am. Compl., Docket # 20). The Defendants filed their motions for summary judgment on November 15, 2019. (Docket # 50, Docket # 51.) The motions are now fully briefed and ready for resolution.

The Defendants also filed a motion to strike the declarations of Sean Tourtillot (Docket # 67) and Kurt Zunker (Docket # 68), asserting that portions of these declarations are inadmissible hearsay and lack proper foundation. (Docket # 79.) The declarations are immaterial to the dispositive issues on summary judgment; as I explain where relevant, even if considered, they do not change the outcome. Therefore, I will deny the motion to strike as moot.

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio*

6

*Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Felde's Amended Complaint asserts that Milwaukee County violated Title VII by subjecting him to a sexually hostile work environment because of his sexual orientation and failure to conform to stereotypical gender norms for men, causing his constructive discharge.[1] (Am. Compl. ¶¶ 112–115.) Felde also argues that the individual defendants violated his right to equal protection under the Fourteenth Amendment. (*Id.* ¶¶ 119–121.) Finally, Felde argues that Milwaukee County violated the ADA and the Rehabilitation Act by failing to reasonably accommodate his disability of bipolar disorder. (*Id.* ¶¶ 122–124.) The Defendants have moved for summary judgment on all of Felde's claims. I will address each claim in turn.

---

[1] Felde also alleges retaliation under Title VII. (Am. Compl. ¶¶ 116–118.) However, Felde does not oppose the County's motion for summary judgment on that claim. (Docket # 73 at 1.)

7

*1.     Title VII*

Felde argues that the County violated Title VII by subjecting him to a hostile work environment because of his sexual orientation and failure to conform to stereotypical gender roles for men, causing his constructive discharge. (Am. Compl. ¶¶ 112–114.) The County asserts that many of Felde's allegations are untimely; that even if not, Felde cannot prove actionable sexual harassment; and that if even he could show sexual harassment, there is no basis for employer liability. (County's Br. in Supp. of SJ, Docket # 64 at 2–20.)

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). A work environment violates Title VII when it is "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

To prevail on a sexually hostile work environment claim, a plaintiff must establish that (1) he was subjected to unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (2) the conduct was severe or pervasive enough to be both objectively offensive and subjectively abusive; (3) the conduct was directed at him because of his sex; and (4) there is a basis for employer liability. *Rhodes v.*

8

*Illinois Dept. of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016).

The standard for imputing Title VII liability for workplace harassment to an employer depends on whether the harasser is a supervisor or co-worker. *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011) (citing *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764–65 (1998)), *aff'd*, 570 U.S. 421 (2013). Generally, employers are "strictly liable" for harassment inflicted by supervisors. *Id.* However, an employer can also be liable for a hostile work environment created by co-workers if the employer was negligent in discovering or remedying the harassment. *Id.* at 471 (internal citations and quotations omitted); *see also Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 386 (7th Cir. 2007) ("[E]mployers are not vicariously responsible for misconduct in the workplace; employers are responsible for their own conduct (or omissions)—which is to say, for how they respond (or fail to respond) after receiving notice that an employee may be suffering from disparate treatment at co-workers' hands." (citing *Faragher v. Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *Dunn v. Washington County Hospital*, 429 F.3d 689 (7th Cir. 2005))); *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 953 (7th Cir. 2005). "An employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Id.* (internal citations and quotations omitted); *see also Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004).

9

Assuming without deciding that all of Felde's allegations are timely[2] and that they meet the first three elements of a sexually hostile work environment claim, Felde cannot show that the County is liable for the alleged sexual harassment. Because I find no basis for County liability, I need not decide whether Felde can show a sexually hostile work environment.

### 1.1    Supervisor Liability

A "supervisor" under Title VII "'is someone with power to *directly* affect the terms and conditions of the plaintiff's employment.'" *Vance*, 646 F.3d at 470 (citing *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004) (emphasis in original)). This power "primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee." *Id.* (citing *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002) (internal quotation marks and citations omitted)). Merely having authority to oversee aspects of another employee's job performance does not render an employee a "supervisor" within the meaning of Title VII. *Rhodes*, 359 F.3d at 506 (citing *Hall*, 276 F.3d at 355); *see also Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008) (explaining that "[a] 'supervisor' for purposes of Title VII is not simply a person who possesses authority to oversee the plaintiff's job performance" and that "directing work activities and recommending disciplinary action are not in and of themselves sufficient to make someone a supervisor under Title VII").

The only "supervisor" Felde alleges to have engaged in sexual harassment against him is Marcus Brown (Pl.'s Br. in Opp. to County's Mot. for SJ, Docket # 73 at 17–18), but

---

[2] Because I find no employer liability, I need not address the timeliness of Felde's claims. I note, however, that if Felde had been subjected to the type of distressing sexual harassment he claims to have endured from the beginning of his employment, I fail to understand—and Felde does not explain—why he waited more than ten years to file an EEOC charge.

Brown was not Felde's "supervisor" for Title VII purposes. Brown had no power to hire or fire Felde and Felde admitted that he had no knowledge of whether Brown could directly promote, demote, or transfer him. (Declaration of Ronald Stadler ("Stadler Decl.") ¶ 3, Ex. A at 8–9, Docket # 63-1.) Brown purportedly had authority to direct and assign Felde's work, evaluate his job performance, and issue formal appraisals (PPFOF ¶ 20), but these do not establish supervisory status under Title VII. *See Rhodes*, 359 F.3d at 506; *Andonissamy*, 547 F.3d at 848. Although Felde asserts that when Brown was promoted from the position of airport maintenance worker to assistant airport maintenance supervisor Brown had the power to discipline him (Declaration of Douglas W. Felde ("Felde Decl.") ¶ 21, Docket # 72), Felde also admits that as an assistant supervisor, the only level of discipline Brown could impose on him was issuing a written reprimand (DPFOF ¶ 10 and Pl.'s Rep. ¶ 10). Furthermore, the only evidence of "discipline" enacted by Brown is Felde's testimony that Brown issued a written reprimand when Felde stopped to get a cup of coffee on the way to a work assignment. (Deposition of Douglas W. Felde ("Felde Dep.") at 29:17–30:11, Docket # 53.) This written reprimand is not alleged to have affected any aspect of Felde's employment, so it is not evidence that Brown was Felde's "supervisor" for Title VII purposes. *See generally Oest v. Illinois Dep't of Corr.*, 240 F.3d 605 (7th Cir. 2001) (distinguishing materially adverse employment actions from oral or written reprimands that did not materially affect employment), *overruled on other grounds by Ortiz*, 834 F.3d 760. Because Brown was not a "supervisor" under Title VII, the County is not vicariously liable for his allegedly harassing behavior toward Felde.

11

### 1.2 Co-Worker Liability

The County argues that Felde cannot show that it is liable for co-worker harassment because the County was not negligent in discovering or remedying the harassment. (County's Br. in Supp. of SJ at 16–17.) Felde disagrees, arguing that the County had notice of sexual harassment for years but failed to take steps to remedy it. (Pl.'s Br. in Opp. to County's Mot. for SJ at 14–17.)

To prove employer negligence toward co-worker harassment, a plaintiff must show that the employer had knowledge of the harassment. *See Faragher*, at 799–800. Generally, "an employee usually must make a concerted effort to inform the employer that a problem exists," such as "lodging a complaint with human resources or telling high-level management about the harassment." *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922 (7th Cir. 2017) (internal quotations and citations omitted); *see also Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 479 (7th Cir. 2004) (plaintiff had not provided sufficient detail about what he had told his employer to show that his reports of the "frequent use of racial remarks" by certain co-workers "would have put [the employer] on notice that there was a problem requiring a remedy"). An employer may also be liable if it had constructive knowledge—that is, if notice of the harassment came to the attention of someone who had a duty under the terms of his employment to pass on the information to someone in the company who had the power to take action to address the harassment. *Id.* (citing *Faragher*, 524 U.S. at 799–800; *Hrobowski*, 358 F.3d at 478 ("[A]n employer could be charged with constructive notice where the harassment was sufficiently obvious."); *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997)).

12

Once the employer has notice of the harassment, it can avoid liability if it promptly takes corrective action reasonably likely to prevent the harassment from recurring. *Tutman v. WBBM–TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000); *see also Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004) (holding employer not liable for harassment where response to harassment was "reasonable under the circumstances as then existed") (internal citations omitted). The relevant question is not whether the employer's remedial measures were effective, but whether the employer promptly investigated complaints and took appropriate action. *See Vance*, 646 F.3d at 473 ("[T]he ideal result of an employee's complaint would be that the harassment ceases. But Title VII does not require an employer's response to successfully prevent subsequent harassment, though it should be reasonably calculated to do so.") (internal citations and quotations omitted).

After careful review of the record, I find that the County did not have actual notice of sexual harassment of Felde prior to January 30, 2012, and that Felde cannot show that the County was negligent in responding to his complaints either before or after that date.

### 2004–2012

Felde asserts that he reported sexual harassment to Lukas in November 2005. (Pl.'s Br. in Opp. to County's Mot. for SJ at 14.) However, Felde's report cannot reasonably be construed as complaining of sexual harassment. Felde complained only that a supervisor made what Felde believed to be a lewd gesture toward him and remarked "F--- him," referring to Felde. (Felde Decl. ¶ 13, Ex. 1, Docket # 72-1.) Felde complained that he "felt disgusted and humiliated that a supervisor would display such atrocious behavior towards a worker and in such a public environment." (*Id.*) Inappropriate as this behavior may have been, it was a single episode of obscenity and rudeness and unrelated to Felde's personal

13

sexual characteristics. This complaint would not have put a reasonable supervisor in Lukas'
position on notice that Felde was being subjected to a hostile work environment, let alone
on the basis of sex. *See Zimmerman v. Cook County Sheriff's Dept.*, 96 F.3d 1017, 1019 (7th Cir.
1996) ("[A plaintiff] cannot withstand summary judgment without presenting evidence that
she gave the employer enough information to make a reasonable employer think there was
some probability that she was being sexually harassed."); *Perry v. Harris Chernin, Inc.*, 126
F.3d 1010, 1013 (7th Cir. 1997) ("[n]ot every unpleasant workplace is a hostile
environment. The 'occasional vulgar banter, tinged with sexual innuendo, of coarse or
boorish workers' would be neither pervasive nor offensive enough to be actionable."
(quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)).

Even if Felde's complaint could be construed as complaining of sexual harassment,
Felde cannot show that the County responded negligently. Lukas met with Felde about the
complaint and explained to Felde that Felde's co-workers were irritated because Felde was
the newest employee at the airport but came in with fifteen years of seniority. (Stadler Decl.
¶ 4, Ex. B at 7, Docket # 63-2.) Felde described this meeting as a "hearing" and indicated
that the offending co-worker denied the acts, but apologized anyway. (Felde Decl. ¶ 64, Ex.
10 at 3, Docket # 72-10.) Holding a hearing with Felde and the accused co-worker to
discuss allegations of behavior the employer reasonably understands to be unrelated to
Felde's sex or sexuality hardly shows negligence toward sexual harassment against Felde.

Felde next asserts that on or around March 8, 2006, he told airport supervisor Jim
Remus that co-workers John Sprague and Mark Anastasi were harassing him. (PPFOF ¶
15.) However, Felde does not specify what behavior by Sprague and Anastasi he
complained of at that time, and Felde has not alleged any behavior by Sprague and Anastasi

14

prior to that date that could be considered sexual harassment. Felde complains that Sprague often whistled in Felde's direction in the same manner as if calling for a dog and would rattle his papers to try and get a reaction from him. (PPFOF ¶ 14.) Anastasi would wait for Felde to arrive in the morning and, as he walked toward the coffeemaker, he would pour all the coffee out. (*Id.*) Sprague and Anastasi would snap their fingers in Felde's face and point at him and purposely belch in his presence and repeatedly moved his table to areas where he would be "vulnerable to harassment." (*Id.*) Felde describes only crass, juvenile conduct; nothing about such reports would have alerted Remus that Felde was being subjected to sexual harassment. Furthermore, there is evidence that someone from management discussed the allegedly offending behavior with Sprague and Anastasi; Felde asserts that Sprague and Anastasi later angrily confronted Felde in the main shop and Anastasi said, "What the f---, you went to management on us?" (*Id.*) These facts simply provide no basis from which to infer negligence toward sexual harassment.

Felde further claims that in January 2007 he reported an incident in which Sprague forcefully chest-bumped Felde. (*Id.* ¶ 16.) He also claims to have complained several times about being denied training in 2007 (*Id.* ¶ 17); reported a 2008 incident when a co-worker was hostile and aggressive toward him (*Id.* ¶ 18); and reported vandalism of his personal property in late 2011 and/or early 2012, including that his truck box was bent, his wallet was stolen, and his prescription sunglasses were crushed (*Id.* ¶ 30). Even if this is all true, there is nothing about these encounters as described by Felde that would have put a reasonable supervisor on notice of *sexual* harassment against Felde. Nor does Felde argue that the County had constructive notice of sexual harassment during this time.

In sum, Felde has not shown that the County had notice of sexual harassment against him prior to 2012, so there is no basis for County liability prior to that date.

**2012**

The earliest date on which the County can be said to have had notice of alleged sexual harassment against Felde is January 30, 2012. On that date, the County held a disciplinary hearing about an altercation between Felde and co-worker Sandy Carney in which Felde had allegedly made threatening comments. (PPFOF ¶¶ 31, 114 and Defs.' Resp. ¶¶ 31, 114.) At that hearing, Felde and his union representative reported to Lukas and Moore that he had been called sexually derogatory names, been questioned about his sexual preferences, been verbally and physically bullied by co-workers, and had his personal property vandalized. (PPFOF ¶¶ 31–33 and Defs.' Resp. ¶¶ 31–33.)

Assuming without deciding that the statements at the January 2012 hearing gave the County actual notice of alleged sexual harassment, Felde cannot show that the County failed to appropriately address his concerns. The County's sexual harassment policy required managers like Lukas to report such behavior to Human Resources promptly for investigation. (Brown Decl. ¶ 3, Ex. A at 3–4, Docket # 52-1.) Here, it would have been pointless for Lukas to "report" the issue to Human Resources because the Human Resource Coordinator, Moore, was present at the hearing. As for Moore, he, and Terry Blue (the Deputy Director of Maintenance Operations), met with Felde privately in February 2012 to discuss the allegations from the hearing. (PPFOF ¶¶ 34–35 and Defs.' Resp. ¶¶ 34–35.) Even construing the evidence in the light most favorable to Felde, he cannot show that he put Moore on notice of any sexual harassment for which remedial action would have been a reasonable response. It is unclear exactly what Felde told Moore, but he indisputably

16

disclosed various incidents by various employees over the course of his eight-year employment, some of which had occurred years prior. (PPFOF ¶¶ 34–35, Felde Decl. ¶ 64, Ex. 10 at 3.) He claims to have told them about "sexual harassment and bullying" perpetrated by Sprague and Anastasi, but as noted above, the actions by these individuals that he alleges prior to February 2012 have no apparent relationship to Felde's sexuality. He also claims to have named Marcus Brown, but there is no evidence about what he specifically reported about Brown's conduct.

As far as what the evidence reveals Felde's complaints were, the County acted reasonably in responding to them. Allegations that were several years old—up to eight years, apparently—were neither investigable nor actionable.[3] The only incident Felde claims to have described to Moore with any particularity is the incident with Wilson (PPFOF ¶¶ 34–35), which had allegedly occurred long before this meeting.[4] (Felde Decl. ¶ 26.) As for that allegation, Moore opined that this sounded like sexual assault and suggested contacting law enforcement, but Felde refused, explaining later that he had feared embarrassment and retaliation by Wilson and other co-workers. (PPFOF ¶ 37; Felde Decl. ¶ 64, Ex. 10 at 3.) The staleness of Felde's allegation and his failure to cooperate with the course of action Moore reasonably believed was appropriate scuttle any argument that Moore was negligent

---

[3] During an April 2015 meeting, Felde read a six-page statement in which he made allegations of harassment dating back to early 2013. Terry notes that given the age of the allegations, it is now "too late to act on [the allegations] or investigate." (Brown Decl. ¶ 6, Ex. D, Docket # 52-4 at 1.)

[4] It is unclear exactly how long. Felde states that this happened in the summer or fall of 2011. (PPFOF ¶ 28.) However, he elsewhere indicated that it had occurred several years prior to his meeting with Moore.

> I told Sean Moore H.R. and Terry Blue assistant director many of my hostile experiences I had. Two I mentioned and described was with Dushon Wilson in the men's Locker room when he hit me in the head with his penis and another when I witnessed Dushon horse playing around and urinated on Ruben Angeles at the wash rack. These past incidents happened several years earlier as I told [Moore and Blue] some of my experiences.

(Felde Decl. ¶ 64, Ex. 10 at 3.)

17

in not pursuing this allegation further.[5] Holding Moore responsible for not doing so would be impermissibly playing Monday-morning quarterback for human resources, which is not the purpose of Title VII. *See Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 895 (7th Cir. 2016) ("A court is not a 'super personnel department that second-guesses employers' business judgments.'") (internal citation omitted).

Importantly, by Felde's own account, the County *did* take actions to address his complaints, and those actions were reasonable. Felde stated that in response to his reports to Moore, the County commissioned a broad study to identify workplace discrimination, held a training based on the results, and hired a full-time Human Resources representative for the airport. (Felde Decl. ¶ 64, Ex. 10 at 3; Brown Decl. ¶ 6, Ex. D at 24, Docket # 52-4.) Moore also relayed Felde's allegations to Felde's manager, Lukas, which Moore explained was an attempt to put Lukas on heightened alert for potential sexual harassment. (Moore Dep. at 37:19–23, 38:16–21.) These steps were more than reasonable in the circumstances of Felde's scattered, often untimely complaints and, the County indisputably took appropriate actions reasonably designed to identify and address the problems Felde had alleged.

### 2013

Felde asserts that he complained to Skowronski in 2013 about his co-workers ridiculing his biking clothes and making offensive and demeaning remarks about the fit of his biking clothes and his state of undress in the locker room. (PPFOF ¶ 54.) Felde describes taunting by a number of co-workers and states that the taunting continued from 2011 to 2016. (PPFOF ¶¶ 50–53.) However, Felde does not say what specific information he gave *to*

---

[5] Felde insists he never told Moore he did not want the matter with Wilson investigated, only that he did not want to go to law enforcement about it. (PPFOF ¶¶ 37–38.) This is immaterial. Moore took the reasonable steps of discussing Felde's allegation with him and suggested a reasonable course of action, which Felde refused.

*Skowronski in 2013.* Which co-workers did he complain of? What did he complain each of them were doing? Or was it a general complaint about the work environment? Would a reasonable supervisor have interpreted it as a complaint about sexual harassment? And importantly, was his complaint made before or after the County circulated a reminder to all of Felde's co-workers and supervisors about the County's sexual harassment policy in March of that year? (Brown Decl. ¶ 5, Ex. C, Docket # 52-3.) It is impossible to find the County's response to this complaint negligent without knowing what Felde told Skowronski and when. Furthermore, Felde admits he does not know what Skowronski did in response to his complaint, and Felde did not complain of this taunting again until at least December 2014, or possibly April 2015. (Brown Decl. ¶ 11, Ex. I, Docket # 52-9 at 58–59.) With no evidence that Felde complained to Skowronski in a manner that actually alerted him to the possibility of sexual harassment and the need for remedial action; no evidence about what Skowronski may have done in response; and indications that the County was making remedial efforts around that time, Felde cannot show that the County was negligent in 2013.

### 2014–2015

Felde's argument that the County was negligent in handling his reports of sexual harassment in 2014 and 2015 is contrary to the evidence. Felde asserts that in December 2014, he complained to Skowronski about sexual harassment, intimidation, and bullying by Howard Campbell; Larry Bongard's efforts to instigate a fight between Campbell and Felde; and "all the other incidents of sexual harassment to which he had been subjected at GMIA." (PPFOF ¶¶ 59–60.) Yet, Felde admits that Skowronski interviewed him four times about these allegations and Lukas interviewed him once. (Felde Dep. at 51:1–3.) Felde

himself stated in his EEOC intake questionnaire filed in March 2015 that Skowronski "investigated a case of bullying and sexual harassment I reported recently involving . . . Howard Cambell [sic]." (Stadler Decl. ¶ 5, Ex. C, Docket # 63-3 at 5.) Lukas promptly notified Campbell—the co-worker Felde had specifically accused of sexual harassment—that there would be a disciplinary hearing on December 23. (Supplemental Declaration of Ronald Stadler ¶ 4, Ex. F, Docket # 82-2.) Notes from Terry indicate that Campbell ultimately received a "counseling" for this incident. (Brown Decl. ¶ 6, Ex. D, Docket # 52-4 at 2.)

Also in December 2014, Skowronski met with the maintenance staff on Felde's shift and distributed a one-page memorandum regarding "coworker sexual harassment, intimidation and bullying in the South Shop." (Felde Decl. ¶ 56, Ex. 5, Docket # 72-10 at 1.) Felde indicated that employees "had to sign for it." (Felde Dep. at 51:23–25.) The memorandum stated:

> Recent reports of Sexual Harassment, Intimidation and Bullying have occurred at South Shop and are under investigation. Intimidating, Harassing or Bulling behavior that creates a hostile work environment or is directed at any individual are not tolerated at this facility, and are taken very seriously. There is a zero tolerance policy in effect and has been in effect. Please review the sexual Harassment/Harassment policy on the Milwaukee County website. Failure to comply with this policy can lead to discipline, up to and including termination.
> http://county.milwaukee.gov/Sexua1HarassmentPoli17546.htm
>
> Employees are absolutely not to take part in these activities, and are under an obligation to REPORT any such incidents to the Supervisor Ken Skowronski II immediately.

(Brown Decl. ¶ 8, Ex. F, Docket # 52-6.) Skowronski also asked Felde to put his complaints about alleged harassment over the course of his employment in writing. (PPFOF ¶ 62.) Felde did not provide the written statement until April 27, 2015. (Felde Dep. at 50:5–51:15.)

20

On February 20, 2015—more than two months before Felde submitted the statement Skowronski had requested—Felde filed a grievance form complaining of a hostile work environment. (PPFOF ¶ 69 and Defs.' Resp. ¶ 69.) Felde complains that neither Lukas nor Skowronski nor anyone from Human Resources ever got back to him regarding his grievance. (*Id.*) The record clearly contradicts this, showing that the County assiduously followed up with Felde about this grievance. Terry's notes indicate that she received this grievance form on February 25, 2015. (Brown Decl. ¶ 6, Ex. D, Docket # 52-4 at 1.) She asked Skowronski to speak with Felde to let him know they would set up a meeting; Skowronski did so; and they set up a meeting on February 27, 2015 at 8:00 a.m. (*Id.*; *see also* Deposition of Lisa R. Terry ("Terry Dep.") at 52:10–19.) Terry's notes indicate that Felde canceled that meeting at the last minute, stating that he needed more time to prepare his written thoughts with dates and times. (*Id.*; *see also* Terry Dep. at 52:18–19, 71:16–17.) Terry's notes also state that between February 27 and April 27, 2015, Skowronski continued to check in with Felde to see if he was ready to meet, but Felde continued to request more time to put his statement together. (*Id.*) Terry indicated that she tried to set up another meeting for March 23, 2015, but Felde stated he did not yet have the information in order. (*Id.*; Brown Decl. ¶ 6, Ex. D, Docket # 52-4 at 22.) Felde finally indicated on April 23, 2015 that he was ready to meet; Terry set up a meeting for April 27, 2015 at 12:30 p.m. (*Id.*)

At the April 27, 2015 meeting, Felde read a six-page statement addressed to Terry. (Brown Decl. ¶ 6, Ex. D, Docket # 52-4 at 1.) Terry's notes indicate that on the same day, she spoke to both Lukas and Moore regarding some of Felde's allegations. (*Id.*) Terry explained that since most of Felde's allegations occurred prior to her employment, she did not understand much of the narrative, so she was seeking clarification. (Terry Dep. at

21

67:15–68:2, 69:19–23, 80:19–25.) She explained that neither she nor Moore had copies of Moore's investigation notes because Moore had changed positions by then and the County had moved Moore's files, and despite her efforts she could not locate them. (Terry Dep. at 81:1–19.) Her notes indicate that Moore confirmed he and Blue had met with Felde around 2013 and that Felde had reported an incident from years prior and that Felde had asked them not to talk to the offending co-worker. (Brown Decl. ¶ 6, Ex. D, Docket # 52-4 at 15.) Terry's notes from her conversation with Lukas state that Felde had complained about being picked on and teased; that Felde had strung events together and was hard to follow; and that he had been teased when he started because of seniority. (*Id.* at 16.) Terry noted that the specific December 2014 incidents had been thoroughly investigated by Skowronski and another individual, and that Campbell and Drummond had been disciplined. (*Id.* at 2.) She found Skowronski's actions timely and appropriate. (*Id.*)

In sum, the evidence shows a prompt investigation and appropriate response to Felde's allegations of specific incidents in December 2014 that included disciplinary measures for specific employees found to have acted inappropriately. Once Felde provided the information necessary to investigate his extensive complaints, Terry immediately took action to further investigate. In the light of this evidence, Felde's version of events—that Terry and Skowronski failed to investigate his complaints, act on them, or attempt to meet with him in the months prior to the April 2015 meeting—is "so utterly discredited by the record" that no reasonable jury could believe it. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986) ("A court deciding summary judgment is not required to adopt "a version of the facts that is blatantly contradicted by the record."); *see also De la Rama v. Illinois Dep't of Human Servs.*, 541 F.3d 681, 685 (7th Cir.

22

2008) (stating that a "nonmoving party cannot defeat a motion for summary judgment with bare allegations").

Felde further argues that the County did not adequately investigate his complaints when Terry left her employment soon after the April 27, 2015 meeting and Padilla took over the investigation. (Pl.'s Br. in Opp. to County's Mot. for SJ at 16–17; *see also* Terry Dep. at 10:7–9.) Again, this is clearly contradicted by the record. Felde's file was one of three employee files Terry gave to Padilla for follow-up.[6] (Terry Dep. at 68:17–21, 72:1–4, 81:10–12.) Describing Padilla's follow-up, Felde himself later stated that Padilla had "conducted an extensive investigation" of his complaint. (Brown Decl. ¶ 11, Ex. I, Docket # 52-9 at 26.) Indeed, he did. The investigatory file indicates that Padilla and MaryBeth Buechel interviewed Felde about his allegations twice in July 2015. (*Id.* at 1.) In August and September, Padilla and Buechel interviewed six accused co-workers and two alleged witnesses. (*Id.*) The file includes handwritten notes that appear to relate to Padilla's investigation into the allegations in Felde's April 27, 2015 narrative, including interviews of various accused co-workers and alleged witnesses. (DPFOF ¶¶ 90–91 and Pl.'s Resp. ¶¶ 90–91, Brown Decl. ¶ 11, Ex. I at 1–8.) In light of this documentation, Felde's allegations that Padilla's investigation was deficient to the point of negligent are baffling.

Felde's primary criticism of Padilla's investigation is that he did not interview "his" witnesses, Sean Tourtillott and Carney, who he believes would have confirmed his allegations of sexual harassment based on sexual orientation.[7] (Pl.'s Resp. to DPFOF ¶ 93

---

[6] Terry explained that one employee file was more pressing than Felde's because that employee had access to guns. (Terry Dep. at 79:20–80:4, 83:5–11.)

[7] The claim that Tourtillott and Carney would have confirmed that Felde was being sexually harassed is speculative. Tourtillott states that co-workers and supervisors referred to Felde as "faggot," "homo," and "gay" and that co-workers would whistle at Felde and taunt him about his

23

(citing Carney Dep., Tourtillott Decl.).) But after a careful search, I find no record of Felde telling anyone from the County that Tourtillott or Carney were witnesses to the things he complained of. Felde named them in his EEOC documents (Felde Decl. ¶ 63, Ex. 8, Docket # 72-8 at 4), but not in his communications with the County. Furthermore, the County *did* interview two individuals Felde *had* named as witnesses in his April 27, 2015 statement: Janet Rasmussen and Rashaan Gibson. (Brown Decl. ¶ 11, Ex. I, Docket # 52-9 at 1, 4; Felde Decl. ¶ 64, Ex. 10, Docket # 72-10 at 2.) The County's investigation was clearly appropriate under the circumstances.

Felde also cannot support a claim that the County did not take appropriate action in response to the findings of its investigation, because the results of the investigation failed to corroborate Felde's complaints. Padilla's summary of October 19, 2015 stated:

> No findings that the alleged conduct as reported by Mr. Felde occurred. Employees indicate they haven't observed or participated in behavior considered hostile, physical or sexual in nature towards Mr. Felde. Employees demonstrated they can distinguish between harassing behavior and playful joking and if it is known to offend other would stop. Employees admitted to teasing each other, Felde being an active participant is [sic] the 'teasing' as well as being a recipient.

(DPFOF ¶ 93 (citing Brown Decl., Ex. I at 2).) Title VII hardly required Padilla to act on complaints when reasonable investigation failed to corroborate them. But even so, Padilla *did* act—he ordered cultural competence training by a non-County consultant delivered for

---

biking clothes, but Tourtillott does not claim to have personally witnessed this behavior. (Docket # 67 at 6, 9.) Tourtillott states that Tim Brown told him that he did not like Felde because he was a "faggot" (id. at 7), but evidence of what Brown said to Tourtillott was not evidence of sexual harassment against Felde. Tourtillott also claims that Felde was "isolated, bullied and harassed by his coworkers" and that Brown badgered Felde about his work performance and subjected Felde's work to greater scrutiny compared to that of co-workers," but Tourtillott neither claims to have actually witnessed this behavior nor indicates that this was due to Felde's sex, sexual orientation, or failure to conform to gender stereotypes. And while Carney testified extensively about co-workers' negative treatment of Felde, she indicated that derogatory comments by and about everyone were common and that she did not believe co-workers targeted Felde because of his sexuality.

24

all Department of Transportation employees. (DPFOF ¶ 94 and Pl.'s Resp. ¶ 94.) In 2015, the County provided live training to the GMIA maintenance workers on sexual harassment and discrimination. (DPFOF ¶ 75 and Pl.'s Resp. ¶ 75; Felde Dep. at 52:4–15.) These actions were indisputably reasonable under the circumstances.

Before Padilla had concluded the investigation into Felde's April 27, 2015 allegations, Felde filed another grievance on September 22, 2015. (Brown Decl. ¶ 11, Ex. I, Docket # 52-9 at 25–27.) Felde complained that on August 13, 2015, co-worker Bongard commented, "Hey Doug youre [sic] the only one hear [sic] qualified to do CPR hear [sic]. If you do it on me when we lock lips, I don't want you enjoying it too much ok."[8] (Id. at 27.) This incident was investigated. (Id.)

Felde also claims to have told Padilla in the November 4, 2015 meeting that the inappropriate comments were continuing, but Padilla "dismissed his concerns and refused to listen." (PPFOF ¶ 87.) Even if this is true, it was not unreasonable for Padilla to consider the case closed after his investigation had found no corroboration of specific instances of harassment and he had ordered training to address Felde's reports of a widespread sexually degrading culture.

---

[8] Felde also referred to the December 2014 incident in which Bongard allegedly tried to instigate a fight between Felde and Campbell and a March 5, 2015 incident in which Bongard allegedly became aggressive on the radio toward Felde. Felde stated that "I got no follow up on these incidents by either Ken or administration. I don't know of any inquiries made by Ken or any member of upper management in these matters." (Brown Decl. ¶ 11, Ex. I, Docket # 52-9 at 27.) The record clearly contradicts this statement, which shows Skowronski and Lukas both following up with Felde in December 2014, disciplinary action taken against the offending co-workers, and extensive investigation into Felde's allegations about Bongard's radio communications that found nothing inappropriate. Additionally, there is not the slightest indication in the record that either of these incidents had any relation whatsoever to Felde's sex, sexual orientation, or failure to conform to gender stereotypes. Felde's bare assertions that these were part of a sexually hostile workplace do not create genuine issues of material fact, and his insistence that the County failed to address his complaints is utterly baseless.

In sum, the evidence about Felde's 2014 and 2015 complaints shows that the County reasonably investigated them, took appropriate disciplinary action against individual employees where investigation found it warranted, and provided training to the entire staff designed to remedy the alleged widespread sexual harassment. Even if, as Felde claims, he continued to experience mistreatment by co-workers, the County's response is not judged by its ultimate success in eradicating offending behavior. *Vance*, 646 at 471 ("While it is unfortunate that [the employer's] remedial measures did not persuade [co-workers] to treat [plaintiff] with respect, and we have nothing but condemnation for the type of conduct [plaintiff] has alleged, we find that [the employer] satisfied its obligation under Title VII by promptly investigating each of [the plaintiff's] complaints and taking disciplinary action when appropriate." (citing *Porter v. Erie Foods Int'l Inc.*, 576 F.3d 629, 636 (7th Cir. 2009)). The County's response was not negligent simply because it was imperfect.

Because the evidence shows no basis for County liability, the County's motion for summary judgment will be granted on the Title VII claim.

2.      *28 U.S.C. § 1983*

Felde claims that the four individual defendants violated his right to equal protection under the Fourteenth Amendment. (Am. Compl. ¶¶ 119–121.) The individual defendants move for summary judgment, arguing that Felde cannot show that any of them violated his constitutional rights. (Defs.' Br. in Supp. of SJ, Docket # 66.)

Section 1983 allows individuals to seek redress for violations of their constitutional rights by state actors. *Valentine v. City of Chicago*, 452 F.3d 670, 682 (7th Cir. 2006) (citing *Bohen v. City of East Chicago*, 799 F.2d 1180, 1185 (7th Cir. 1986)). To prevail on a § 1983 claim, the plaintiff must show that the defendant: 1) deprived him of a right secured by the

26

Constitution or laws of the United States, and 2) was acting under color of state law. *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citing *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004)); *see also Gomez v. Toledo*, 446 U.S. 635, 640 (1980). A plaintiff must also show that that the defendant acted with discriminatory intent. *See Bohen*, 799 F.2d at 1187; *see also Locke v. Haessig*, 788 F.3d 662, 676 (7th Cir. 2015) ("A supervisor is liable for undertaking a course of action only because of, not merely in spite of, the action's adverse effects upon an identifiable group."); *Nabozny v. Podlesny*, 92 F.3d 446, 454 (7th Cir. 1996) (explaining that intent is more than negligence); *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982) (explaining that intent implies more than mere volition or awareness of consequences). A court evaluating an employment discrimination claim at the summary judgment stage looks at the totality of the evidence and asks whether a reasonable jury could find that the plaintiff's status in a protected category caused the adverse employment action. *Ortiz v. Werner Enters.*, Inc., 834 F.3d 760, 765–66 (7th Cir. 2016) (rejecting the application of separate legal standards to categories of "direct" and "indirect" evidence).

Having analyzed the entirety of the evidence, I conclude that Felde cannot show that Lukas or Skowronski had discriminatory intent against Felde, that Tim Brown discriminated against Felde, or that Marcus Brown acted under color of state law.

### 2.1    Lukas

Lukas was the airport maintenance manager at GMIA throughout Felde's employment. (DPFOF ¶ 7 and Pl.'s Resp. ¶ 7.) Lukas never personally witnessed any harassment against Felde. (*Id.*) Felde's primary theory of liability is that Lukas failed to intervene to protect him from sexual harassment. (Pl.'s Br. in Opp. to Defs.' Mot. for SJ,

27

Docket # 75 at 2–7.) However, in these circumstances, the failure of Lukas to intervene when he heard of alleged sexual harassment of Felde cannot reasonably be interpreted as evidence of discriminatory intent.

Felde points to the November 2005 complaint he addressed to Lukas, reporting that a supervisor made an obscene gesture toward him, and states that Lukas "took no action to interview the witnesses or discipline the supervisor." (*Id.* at 2.) Even if this were true, no rational fact-finder would conclude that Lukas' inaction was motivated by discriminatory intent. As explained above, no one receiving this complaint would have understood that Felde was being subjected to sexual harassment, let alone that he was being targeted for his sexual orientation or failure to conform to gender stereotypes. Furthermore, Felde admitted that Lukas did act—as explained above, Lukas held a meeting to discuss the incident at which it was suggested that Felde may have misunderstood the incident and it was explained that Felde's co-workers were irritated with Felde because of his seniority. Felde does not even attempt to argue that this was a pretext for discriminatory intent. At most, a jury can reasonably infer that Lukas tolerated a single instance of obscenity and rudeness directed at Felde because of his seniority but not injury rising to the level of violating the Equal Protection Clause.

The next instance of alleged inaction on Lukas' part was seven years later, at the January 2012 disciplinary hearing about the altercation between Felde and Carney, where Felde and his union representative reported that Felde was being called sexually derogatory names, questioned about his sexual preferences, verbally and physically bullied by co-workers, and having his personal property vandalized. (DPFOF ¶ 17 and Pl.'s Resp. ¶ 17; Felde Decl. ¶¶ 28–30; Declaration of Kurt Zunker ("Zunker Decl."), Docket # 68.) The

28

County's policy required managers to report sexual harassment to Human Resources for investigation, but as explained above, there was no reason for Lukas to do so because Moore was also present at the hearing. Moore and Lukas' supervisor, Blue, met with Felde to discuss his allegations of sexual harassment. (Moore Dep. at 28:22–29:1.) Moore testified that he and Blue decided not to involve Lukas because Lukas was too close to some of the individuals allegedly involved. (*Id.* at 29:2–8.) Moore conveyed Felde's allegations to Lukas "so he could address any sexual harassment that came to his attention" and "alert him to the possibility of continued sexual harassment being perpetrated." (*Id.* at 37:19–23, 38:16–21.) Thus, to the extent the evidence says anything about why Lukas did not take further action, that evidence shows that it was because these matters were being handled by other appropriate personnel, not because Lukas had discriminatory intent.

There is no evidence that Lukas observed or that anyone reported to Lukas any further sexual harassment until December 2014, when Felde complained to Skowronski. At that time, Lukas met with Felde to discuss his complaints. (DPFOF ¶ 74 and Pl.'s Resp. ¶ 74.) Felde asserts that he expressed concern that he would face retaliation for reporting the harassment, and that "Lukas' only response was that retaliation 'was to be expected.'" (PPFOF ¶ 64.) To the extent Felde complains that Lukas failed to sufficiently respond, the record shows that Skowronski, not Lukas, was entrusted with investigating and responding to Felde's December 2014 complaints. (Lukas Dep. at 60:3–15.) Lukas was clearly aware of Skowronski's efforts—he was his immediate supervisor (DPFOF ¶ 7) and was copied on the memorandum Skowronski sent to the maintenance personnel at the "South Shop" reminding them of the sexual harassment policy and notifying them that reports of recent harassment were under investigation (Felde Decl. ¶ 56, Ex. 5, Docket # 72-5). However, the

29

fact that Lukas did not "do more" is clearly because someone else was doing it, not because Lukas intended Felde to be harassed.

Similarly, Felde attempts to show discriminatory intent by contrasting the way Lukas handled his allegation about Dushon Wilson with the way Lukas handled Carney's complaint against Felde (Pl.'s Br. in Opp. to Defs.' Mot. for SJ at 3–4), but Lukas did not handle either complaint. Moore did.[9] The only evidence Felde can muster about Lukas' involvement is that Carney testified that Lukas told her he wanted to fire Felde. (*Id.* at 4.) Even if this were admissible as proof of Lukas' mental state, it does not show discriminatory intent. It is unknown what Lukas wanted to do about the Wilson incident, and Carney testified that Lukas did not say why he wanted to fire Felde. (Carney Dep. at 33:23–34:1.)

Felde also claims to have told Lukas repeatedly that the sexual harassment he was enduring was worsening his bipolar disorder and that Lukas refused his request for reassignment to Timmerman as an accommodation. (Felde Decl. ¶ 76.) Even if this is true, there is no evidence that Lukas denied Felde's request for reassignment for discriminatory reasons. The only evidence we have about Lukas' decision-making is Lukas' testimony that he believed, based on reports from the in-charge employee during Felde's past assignment at Timmerman, that Felde needed more supervision than Timmerman could provide. (Lukas Dep. at 101:20–103:12.) There is simply no evidence of any connection between Lukas' decision not to transfer Felde and Felde's sexuality or failure to conform to gender stereotypes. At the very most, the evidence could be read to show that Lukas was aware that

---

[9] Lukas testified that he was not involved in issuing Felde's suspension and did not co-sign the document (Lukas Dep. at 37:6–12), and that Moore was the one was in charge of Felde's disciplinary hearing (*id.* at 35:10–12) and placed conditions on Felde's return to work (*id.* at 45:12–17).

Felde might continue to experience sexual harassment if he were not transferred, and awareness does not suffice to show discriminatory intent. *Shango*, 681 F.2d at 1104.

Felde clearly believes that Lukas ought to have taken further steps to protect him from the perceived sexual harassment. But the Equal Protection Clause does not require employers to take the most aggressive course of action in response to claims of sexual harassment. *See Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 824–25 (7th Cir. 2003) (explaining that subjective dissatisfaction with the remedial action taken does not establish deliberate indifference). Lukas' responses to Felde's complaints— generally to defer to other, more appropriate personnel—were reasonable in the circumstances and do not indicate discriminatory intent. Thus, Lukas is entitled to summary judgment.

### 2.2    Skowronski

Skowronski was an assistant maintenance supervisor at GMIA on and off from 2011 to 2013. (DPFOF ¶ 8 and Pl.'s Resp. ¶ 8.) Felde does not accuse Skowronski of directly harassing him, but claims that Skowronski deliberately disregarded his complaints. (Pl.'s Br. in Opp. to Defs.' Mot. for SJ at 7–11.) As with Lukas, however, there is no evidence that Skowronski had discriminatory intent toward Felde.

Felde alleges that in 2013 he complained to Skowronski about his co-workers' whistling and locker room remarks. However, he admits he does not know what Skowronski did about that complaint, and does not say whether this was before or after the County circulated a memorandum reminding maintenance personnel of the sexual harassment policy and directing them to refrain from such behavior, or before or after the County conducted sensitivity and non-discrimination training. (Felde Dep. at 52:4–15,

31

53:12–54:17.) This allegation is so vague that to find discriminatory intent based on Skowronski's responses to it would be to pull it out of thin air.

Where there is meaningful evidence of Felde's complaints and Skowronski's responses, the record shows that Skowronski did not respond with deliberate disregard. As explained above, when Felde made several complaints to Skowronski in December 2014, Skowronski immediately interviewed Felde multiple times about his allegations, and Campbell—the employee whom Felde had specifically accused of sexual harassment—was eventually disciplined. In Felde's complaint to the EEOC, he even acknowledged that Skowronski had investigated the incident and that Campbell was being disciplined. (Stadler Decl. ¶ 5, Ex. C, Docket # 63-3 at 5; Felde Dep. at 106:1–12.) In response to Felde's more sprawling complaints of harassment over a long period of time, as explained above, Skowronski promptly gathered employees to remind them of the County's sexual harassment policy, and also invited Felde to reduce his complaints to writing for clarity. In 2015, the County investigatory file and the testimony of their author are clear that Skowronski repeatedly contacted Felde about obtaining his written summary and meeting with Human Resources personnel. When Felde finally provided his statement in April 2015, he directed it to Terry, who took over the investigation.

Felde also accuses Skowronski of failing to reassign him to Timmerman, but no reasonable fact-finder would infer discriminatory intent from this. Assuming without finding that Skowronski had authority to assign Felde to Timmerman, there is no information in the record about why Skowronski did not do so.[10] As with Lukas, at most a fact-finder could

---

[10] Skowronski did state that a lot of people applied for Timmerman (Deposition of Kenneth Skowronski II 52:11–12, Docket # 61)—it seems to have been a highly desirable assignment—but

32

infer that Skowronski was aware that Felde might be harassed if he were not transferred, and this does not rise to the level of discriminatory intent to show an equal protection violation. In short, the evidence shows that Skowronski responded promptly and appropriately to Felde's complaints. As Felde cannot show discriminatory intent, Skowronski is entitled to summary judgment.

### 2.3    Tim Brown

Tim Brown supervised Felde from May 1, 2013 until Felde's retirement in 2016. (DPFOF ¶ 9 and Pl.'s Resp. ¶ 9.) The County argues that Felde alleges no actions by Brown that could plausibly constitute sexual harassment or discrimination. (Defs.' Br. in Supp. of SJ at 3.) I agree.

Felde accuses Brown of directing sexual innuendos at him (PPFOF ¶ 45), but this is unsupported by the evidence. Felde alleges that in March 2014, Tim Brown made an off-color comment in Felde's presence and in May 2014 he said in Felde's presence, "I think I'll go back to my desk now and masturbate." (*Id.*) Neither of these comments was directed at Felde and neither had anything to do with Felde's sexual orientation or failure to conform to gender stereotypes. Felde further claims that Tim Brown was "hostile and aggressive" toward him. (PPFOF ¶ 41.) He alleges that Brown threw a piece of ice or a snowball at him on February 9, 2014 and blocked his vehicle and yelled at him, gritting his teeth and shaking his fist, on February 20, 2014. (PPFOF ¶¶ 41–42.) But there is no evidence that any of these actions was even remotely related to Felde's sexual orientation or failure to conform to gender stereotypes, so they do not support a claim of discrimination. *See Hildebrandt*, 347 F.3d at 1034–35 (explaining that off-color remarks made in employee's presence and not

---

Skowronski could not recall how the assignments were made, generally or in Felde's case (*id.* at 52:15–53:12).

33

directed at her did not amount to discriminatory changes in the terms and conditions of employment) (citing *Adusumilli*, 164 F.3d at 361). Felde's allegations that he believed these actions were directed at him because he was present and Brown "would have known [he] was gay" (PPFOF ¶ 46) are conclusory.

Felde claims that Tim Brown badgered him and scrutinized his work more than that of other employees. (PPFOF ¶ 49.) He points to the 2014 performance review in which Brown opined that Felde needed improvement in the area of communication skills. (Felde Decl. ¶ 38.) This is a rather innocuous performance review, but more importantly, Felde has not presented evidence of performance reviews Brown gave to any other employee. Without such evidence for comparison, Felde cannot show that Brown subjected him to greater scrutiny, let alone that he did so with discriminatory intent.[11] Felde also claims that Brown discriminated against him in imposing discipline. (PPFOF ¶ 47.) The sole alleged example of this, however, is that Tim Brown issued a disciplinary counseling to Felde but did not discipline a co-worker for a similar workplace incident, for which the only proof is Felde's conclusory and vague statement to that effect. (PPFOF ¶ 47 and Defs.' Resp. ¶ 47; DPFOF ¶ 99 and Pl.'s Resp. ¶ 99.)

Felde further alleges that Tim Brown discriminated against him regarding shift selection procedures and assignment to Timmerman Airport. (Pl.'s Br. in Opp. to Defs.' Mot. for SJ at 15.) Felde claims that after Felde requested reassignment to Timmerman, Brown threatened to assign him to a less-preferred shift if he did not withdraw his request. (PPFOF ¶ 100.) Felde asserts that other co-workers were not threatened in this way (*id.*), but

---

[11] Tourtillott also stated that Tim Brown subjected Felde's work to greater scrutiny (Tourtillott Decl. ¶ 10, Docket # 67), but this is conclusory and devoid of foundation; there is no indication Zunker saw Brown's performance reviews of Felde or anyone else.

Felde does not claim to have personal knowledge of Brown's discussions with any other co-workers about their shift assignments and does even indicate whether they were gay.

Because Felde cannot show that Tim Brown engaged in any discriminatory action against him, Brown is entitled to summary judgment.

### 2.4    Marcus Brown

Marcus Brown worked at GMIA with Felde from approximately 2004 to 2013. (DPFOF ¶ 10 and Pl's Resp. ¶ 10.) Brown was Felde's co-worker before he was an assistant supervisor. (*Id.*) Felde alleges that throughout his employment Brown was vulgar and harassing toward him. (PPFOF ¶¶ 8, 21–26 and Defs.' Resp. ¶¶ 8, 21–26.) The Defendants argue that Felde has not presented any admissible evidence on which a rational fact-finder could conclude that Brown committed the alleged harassment under color of state law. (Defs.' Reply Br., Docket # 77 at 11–15.) I agree.

"'Action is taken under color of state law when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. . . . [A]cts by a state officer are not made under color of state law unless they are related in some way to the performance of the duties of the state office.'" *Valentine v. City of Chicago*, 452 F.3d 670, 682–83 (7th Cir. 2006) (quoting *Honaker v. Smith*, 256 F.3d 477, 484-85 (7th Cir. 2001)). To prevail on a Fourteenth Amendment sexual harassment claim, the plaintiff must show that the defendant had some authority by virtue of his position that he used in connection with the harassment. *Id.* at 683 (finding that there was a material question about whether foreman acted under color of law when his alleged involvement included using his authority to transfer individuals involved in response to sexual harassment allegations); *Walker v. Taylorville Corr. Ctr.*, 129 F.3d 410, 414 (7th Cir.

35

1997) (finding that plaintiff adequately alleged action under color of law when defendant was able to harass plaintiff "because of the position of authority she enjoyed").

Felde asserts that Marcus Brown's position as assistant airport maintenance supervisor gave him significant authority over Felde, including directing and assigning Felde's work, evaluating his job performance, issuing formal appraisals, and imposing disciplinary action. (PPFOF ¶ 20.) Even if so, Brown's alleged harassment of Felde was entirely unrelated to this authority. There was nothing about Brown's position as a supervisor that uniquely enabled him to make sexually harassing comments to Felde—in fact, Felde alleges that Brown engaged in the same behavior both before and after he became a supervisor. There is no evidence that Brown's position of authority in any way emboldened, contributed to, or was otherwise connected to his crude behavior toward Felde. *See Murphy v. Chicago Transit Auth.*, 638 F. Supp. 464, 467–68 (N.D. Ill. 1986) (explaining that actions taken under color of state law "must be related to the state authority conferred on the actor, even though the actions are not actually permitted by the authority" and must "bear some similarity to the nature of the powers and duties assigned to the defendant"); *Burwell v. City of Peoria*, No. 09-1309, 2012 WL 13006042, at *6 (C.D. Ill. Feb. 22, 2012) (explaining that alleged misconduct could not form the basis of a § 1983 Equal Protection claim because, although it was "reprehensible and repulsive," it was purely personal; it bore no relationship to the duties the individual was expected to perform); *Barnard v. City of Chicago Heights*, No. 91 C 3626, 1992 WL 309567, at *3 (N.D. Ill. Oct. 22, 1992) (finding sexual assaults of desk clerk by police sergeant could not be the basis for a § 1983 claim because they were "not even remotely related to the performance of police work" (citing *Thomas v. Cannon*, 751 F. Supp. 765, 768 (N.D. Ill. 1990) (finding no state

36

action where public transit driver attempted to sexually assault two passengers, as attempted rape was "not an act even remotely related to the performance of his job" as a transit driver); *Fairley v. Andrews*, 300 F. Supp. 2d 660, 665–66 (N.D. Ill. 2004) (finding correctional officers acted under color of state law when attempting to prevent reporting of excessive use of force against inmates, as it was "a clear abuse of the power the state vests in correctional officers."))

Felde asserts that Marcus Brown was acting under color of state law because his position as a supervisor implicitly gave co-workers permission to harass Felde. (PPFOF ¶ 23.) There is no evidence that any co-worker was actually emboldened by Brown's harassment, and even if so, this could virtually always be said to be true when a supervisor harasses an employee. Such an interpretation would render meaningless the test for when a supervisor acts "under color of state law." *Cf. Donald v. City of Chicago*, No. 90 C 2360, 1991 WL 62492, at *6 (N.D. Ill. Apr. 16, 1991) ("It is the nature of the act performed, not the clothing of the actor or even the status of being on duty, or off duty, which determines whether the officer has acted under color of state law.") Felde cites *Gorcos v. Town of St. John*, No. 2:15-CV-084 JD, 2016, at *4 (N.D. Ind. Sept. 20, 2016), but that case is inapposite. In *Gorcos*, the harassing supervisor was not found to have acted under color of law merely because he harassed the plaintiff during work hours in the presence of coworkers, but because he had also asserted that his position of authority exempted him from workplace sexual harassment policies. *Id.* All this suggested to the court that the supervisor "used the authority of his office to avoid responsibility for his workplace harassment of a subordinate." *Id.* (citing *DelGadillo v. Town of Cicero*, No. 11 C 7342, 2012 WL 3961234, at *7 (N.D. Ill. Sept. 10, 2012) (finding plaintiff adequately alleged defendants

37

were acting under color of law where, among other things, defendants used their positions as the plaintiff's supervisors to harass her and to prevent her from complaining about their conduct).

The only allegedly offending action by Marcus Brown potentially connected to his supervisory authority is that he asked Felde if he was wearing underwear and in 2012 insisted that Felde show him he was wearing underwear. (PPFOF ¶ 27.) But there is no indication that Brown had authority to enforce the wearing of underwear at work or that he used or abused his position to compel Felde to show him his underwear. Furthermore, even if this was connected with Brown's supervisory position and therefore committed under color of state law, no reasonable fact-finder would conclude that this incident constituted discriminatory harassment. Felde admits that Brown was responding to a complaint from a female co-worker about Felde not wearing underwear at work. (Felde Dep. at 111:7–112:4.) In other words, to the extent Brown was using the authority of his position, he was responding to a co-worker complaint of inappropriate dress at work, not harassing Felde because of his membership in a protected group.

This is not by any means to condone Marcus Brown's allegedly harassing conduct which, if true, was reprehensible. But Brown did not commit these acts under color of state law, so he is entitled to summary judgment on Felde's § 1983 claim against him.

3. *ADA/Rehabilitation Act*

Felde claims that the "cumulative stress caused by my ten-years long exposure to sexual harassment, intimidation and bullying at GMIA substantially aggravated my bipolar disorder and caused me to develop a generalized anxiety disorder." (PPFOF ¶ 90.) Felde claims that the County violated the ADA and the Rehabilitation Act by refusing the

accommodate his disability of bipolar disorder by granting his request for assignment to Timmerman Airport. (Am. Compl. ¶¶ 122–127.) The County moves for summary judgment on these claims, arguing that Felde was not "disabled" because could perform the essential functions of his job, he did not properly request an accommodation, and the accommodation he requested would have been an undue hardship on the County. (County's Br. in Supp. of SJ at 23–26.)

The ADA prohibits employers from discriminating against qualified employees on the basis of qualified disabilities. 42 U.S.C. § 12112(a). Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A).

Likewise, the Rehabilitation Act requires employers to "reasonably accommodate the known physical and mental disabilities of a qualified employee." The standards used to determine whether an employer has violated the Rehabilitation Act by failing to accommodate an employee's disability are identical to the standards applied under the ADA. 29 U.S.C. § 794(d); *Jaros v. Illinois Dept. of Corrections*, 684 F.3d 667, 671–72 (7th Cir. 2012) (explaining that the standard for a failure to accommodate claim is the under the ADA and the Rehabilitation Act).

39

Here, Felde cannot show that he was "disabled" within the meaning of the ADA or the Rehabilitation Act because there is no evidence that his bipolar disorder substantially limited his ability to work. A "substantial limitation" is more than an inability to tolerate a specific work environment; it must substantially limit employment generally. *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996). Mental health problems caused or exacerbated by a particular work environment—rather than the required job functions—do not constitute disabilities under the ADA:

> "[S]ubstantially limits" must mean significantly restricts the ability to perform a class of jobs or a broad range of jobs in various classes. [Plaintiff] claims she can do her job, but not while being supervised by [a particular supervisor]. If [Plaintiff] can do the same job for another supervisor, she can do the job, and does not qualify under the ADA.

*Id.* at 525 (internal citation omitted); *see also Bradford v. City of Chicago*, 121 F. App'x 137, 140 (7th Cir. 2005) (holding that conflict with supervisor or co-workers that has led or could lead to significant mental health problems did not mandate a transfer as an accommodation); *Palmer v. Circuit Court of Cook Cty., Ill.*, 117 F.3d 351, 352 (7th Cir. 1997) (reasoning that conflict with a supervisor or co-workers is not disabling even if it produces anxiety or depression, because "at most it requires the worker to get a new job"); *Summers v. Target Corp.*, 382 F. Supp. 3d 842 (E.D. Wis. 2019) (finding that inability to work at a particular location or for a particular supervisor due to anxiety and depression did not render plaintiff "disabled" unless ability to work at another location or in a similar class of jobs would also be impaired).

By Felde's own account, the intolerable effects of his bipolar disorder were caused by and limited to the specific work environment at GMIA. There is no indication that Felde's ability to perform the functions of an airport maintenance worker was ever "substantially

40

impaired" by his bipolar disorder or eventual generalized anxiety disorder. On the contrary, on his EEOC intake questionnaire, when asked whether his disability prevented or limited him from doing anything ("e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc."), Felde wrote, "[M]y Disability does not prevent me from working." (Am. Compl. Ex. 1 at 3, Docket # 20-1.) In his deposition, Felde admitted that he could perform the essential functions of his job and fulfil his work duties throughout his employment and described his work for the County as "excellent." (Felde Dep. at 147:21–148:16, 150:18–152:19.) Lukas corroborated this, stating that Felde "did good work at Mitchell for us." (Lukas Dep. at 103:10–12.) Certainly, the County would not have continued to employ Felde for eleven and a half years until his retirement if he could not do his job. Felde claims to have had "difficulties" in doing his job, especially toward the end of his employment (Felde Dep. at 147:21–148:16, 150:18–152:19), but he does not deny that he did his job without an accommodation. Furthermore, the difficulties he complained of were specific to the allegedly harassing environment at GMIA. (PPFOF ¶ 81.) The fact that Felde requested reassignment to an identical position at a different location conclusively indicates that his bipolar disorder did not render him "disabled" within the meaning of the ADA. In sum, Felde was not "disabled" because he continued to perform his job without his requested accommodation until he voluntarily retired. Thus, the County is entitled to summary judgment on Felde's ADA and Rehabilitation Act claims.

## CONCLUSION

The record suggests that GMIA's South Shop was a particularly crude and vulgar work environment. I have no doubt that this environment was extremely unpleasant for Felde, perhaps even psychologically harmful. But Title VII does not impose liability for this

41

on the County, because Felde cannot show that he was harassed by any "supervisor" in the meaning of Title VII or that the County was negligent toward his complaints of co-worker harassment. Similarly, Felde cannot show that any individual defendant violated his right to equal protection under the Fourteenth Amendment. As for Felde's ADA and Rehabilitation Act claims, the County's failure to reassign him to a different work environment did not violate these laws because Felde was not "disabled" within the meaning of those statutes. Because there are no genuine issues of material fact that would change the outcome at trial, the motions for summary judgment will be granted in their entirety and the case dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Defendants' motions for summary judgment (Docket # 50, Docket # 51) are **GRANTED**.

**IT IS FURTHER ORDERED** that the defendants' motion to strike (Docket # 79) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 5th day of February, 2021.

BY THE COURT:

NANCY JOSEPH
United States Magistrate Judge